UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| ERIC GLENN HIEB | ) | |
| | ) | |
| V. | ) | NO. 2:12-CV-453 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's application for Supplemental Security Income were administratively denied following a hearing before an Adminstrative Law Judge ["ALJ"]. He has filed a Motion for Judgment on the Pleadings [Doc. 9], and the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 11].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues

differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 33 years old. He has a high school education and has taken several college courses. Although he has held some short term jobs in the past, he has no past relevant work experience.[1]

Plaintiff's relevant medical history is set forth in the Commissioner's brief as follows:

> From February 19, 2009, to March 17, 2009, Plaintiff received treatment at the Center for Family Psychiatry, P.C. (Tr. 190-97). John B. Robertson, Jr. M.D., diagnosed Plaintiff with pervasive developmental disorder, bipolar disorder, learning disorder, circadian rhythm disorder, mixed expressive receptive language disorder, and eating disorder (Tr. 190). At an initial examination, Dr. Robertson observed Plaintiff was cooperative, had good eye contact, and was only "mildly socially awkward" (Tr. 191). Plaintiff had intact memory (Tr. 192). Plaintiff's mother informed Dr. Robertson that Plaintiff had two close friends from high school, he completed some college, and he enjoyed playing video games and making intricate jewelry (Tr. 197). Plaintiff had been living with his mother for the past year, after spending some time in Los Angeles, and Las Vegas (Tr. 197). Plaintiff had a job in Las Vegas, but stopped going to work because his supervisor was "an angry sort of guy" (Tr. 197). On March 13, 2009, Plaintiff's mother reported to Dr. Robertson that she saw "significant improvement" in Plaintiff's symptom control and that he was smiling more often and more socially interactive (Tr. 196). Plaintiff on the other hand, reported medication made him nauseous, his appetite was up, and he felt more irritable (Tr. 196).
> On May 12, 2009, Plaintiff visited for consultation R. Eric Roth, Psy.D., a licensed psychologist and clinical neuropsychologist (Tr. 198-202). Dr. Roth noted Plaintiff complained of "mild" problems with focus, attention, and concentration (Tr.

---

[1] These jobs, while not "past relevant work," were somewhat unusual. They included jewelry repair, being a pizza delivery driver, a lifeguard, and a "stocker and cleaner." [Tr. 56].

2

198). Plaintiff also reported problems recalling details of conversations, and recalling when to take medication and when to pay bills (Tr. 198). He also reported some problems with listening and reading comprehension and described himself as "very socially awkward" (Tr. 198). Dr. Roth observed Plaintiff had poor hygiene and was socially awkward (Tr. 199-200). Plaintiff was alert and performed within the low average range on attention and concentration tests (Tr. 200). Nevertheless, Dr. Roth opined Plaintiff exhibited significant problems with attention and concentration that may result in "mild" problems in his day to day life (Tr. 200). Intelligence Quotient (IQ) testing indicated Plaintiff had a verbal IQ score of 122, a performance IQ score of 129, and a full IQ score of 129 (Tr. 200). Plaintiff's ability to encode, retain and immediately recall information fell within the superior to very superior range, and his ability to perform basic math skills was in the low average to average range (Tr. 200). Dr. Roth noted Plaintiff appeared to lack adequate psychological defenses, he could show poor judgment, and he was unable to engage in normal interpersonal relationships (Tr. 201). Dr. Roth opined that, in Plaintiff's current state, he could not obtain and then maintain any type of employment without planned opportunities for intervention (Tr. 202).

Plaintiff received treatment at Family Physicians of Greeneville from August 19, 2008 through January 5, 2010 (Tr. 203-36). Plaintiff had unremarkable physical examinations, and he was observed as alert, mentally sharp, and in no apparent distress (Tr. 204-05, 207, 210, 213, 215, 217, 219, 222). On October 2, 2009, Plaintiff's mother reported she was "very pleased" with Plaintiff's medication (Tr. 206). She stated Plaintiff had become more productive with his
work (Tr. 206). On January 5, 2010, Kevin Toppenberg, M.D., Plaintiff's family physician, noted that Plaintiff's mother was happy when Plaintiff was taking medication, although Plaintiff was not (Tr. 203). Nevertheless, Dr. Toppenberg noted Plaintiff was "getting by at least fairly well" without medication (Tr. 204).

Marianne E. Filka, M.D., a consultative examiner, examined Plaintiff on June 10, 2010 (Tr. 237-41). Dr. Filka observed Plaintiff was a good cooperative historian with average to high average intellectual functioning (Tr. 240). She noted he appeared neat and clean and had a pleasant demeanor, although at times he was loud and argumentative with his mother (Tr. 240). His physical examination was unremarkable (Tr. 240-41). She observed that his thoughts were logical, his mood and affect appeared normal, he was not hyperactive in the examination room, and his attention and concentration were appropriate (Tr. 241). Dr. Filka opined that she would not restrict Plaintiff physically in any way (Tr. 241). She stated that Plaintiff's main problems were his difficulty with people and his difficultly maintaining focus and speed when working (Tr. 241).

Donna Abbott, M.A., a senior psychological examiner, completed a consultative examination report dated August 12, 2010 (Tr. 247-51). She noted that at his July 23, 2010 examination, Plaintiff presented with a clean and casual appearance (Tr. 247). Ms. Abbott noted Plaintiff was cooperative, he exhibited intact memory, and he could perform average math calculations (Tr. 248-49). He was able to attend and concentrate at the exam, and he could follow directions (Tr. 249). He

3

was somewhat conversational and fairly pleasant, he did not appear anxious, he had good eye contact, his stream of conversation was logical and goal directed, and he appeared rational and alert (Tr. 249). Ms. Abbott noted there were no observable tremors or psychomotor retardation and Plaintiff walked with a normal gait (Tr. 249). As to daily activities, Plaintiff reported that he watched television, played games, designed jewelry, did the laundry, cooked his own food, washed his own dishes when reminded, and was able to go to the grocery store (Tr. 250). He also reported having a checking account at the time and that he could manage his own money if he sat down and did it (Tr. 250).

Ms. Abbott concluded Plaintiff was likely to have significant difficulty maintaining attention and concentration throughout a regular workweek, he was likely to be limited in his ability to interact socially due to his inflexibility and intolerance, and his general adaptive skills showed significant limitation (Tr. 251). Ms. Abbott stated Plaintiff could drive and travel alone (Tr. 251). She also stated equivocally Plaintiff "may" have moderate difficulty setting goals and making plans to achieve those goals, significant difficulty working in proximity to others, significant difficulty adapting to change, and significant difficulty dealing with stress (Tr. 251). Ms. Abbott also opined that Plaintiff was capable of managing his resources (Tr. 250).

In notes dated October 25, 2010, John C. Schureman, Ph.D., who treated Plaintiff from November 22, 2002 through September 27, 2005 (Tr. 275) concluded Plaintiff had multiple overlapping neurodevelopmental disorders that include a wide spectrum of processing, language, motor, cognitive, affective, perceptual, and behavioral output disorders (Tr. 273). He noted that during his treatment, Plaintiff did not respond well to medication, "although with vigilant monitoring and constant adjustment in titration, his performance envelope was increased and sustained during treatment" (Tr. 277). Dr. Schureman stated that "when the full complement of pharmacological, psychosocial, AST, and familial scaffolding is removed" therapeutic progress is lost and Plaintiff lacks the ability to sustain adaptive autonomous functioning, leaving him "markedly disabled" (Tr. 278). He opined Plaintiff's ability to disambiguate complex social affiliations is severely impaired and his ability to sustain attention to complete a task is "virtually impossible" (Tr. 273). Dr. Schureman concluded Plaintiff would never be able to support himself (Tr. 278).

On August 20, 2010, Frank D. Kupstas, Ph.D., completed a Mental Residual Functional Capacity Assessment (MRFC) form (Tr. 254-56). The MRFC form Dr. Kupstas completed included three sections: Section I, titled "Summary Conclusions"; Section II, titled "Remarks"; and Section III, titled "Functional Capacity Assessment" (Tr. 254-56). The instructions in Section I, "Summary Conclusions," directed the person completing the form (here, Dr. Kupstas) to record a "[d]etailed explanation of the degree of limitation for each category (A through D), as well as any other assessment information [he deemed] appropriate . . . in Section III (Functional Capacity Assessment)" (Tr. 254). Section III instructed Dr. Kupstas to explain his Section I summary conclusions in a narrative form (Tr. 256) . In Section

4

I, Dr. Kupstas marked that Plaintiff was "moderately limited" in several areas, including the abilities to carry out detailed instructions, concentrate for extended periods, and to work with and in close proximity to others, including supervisors (Tr. 254-55). Dr. Kupstas also noted Plaintiff was markedly limited in his ability to interact appropriately with the general public (Tr. 255).

    Dr. Kupstas concluded in Section II, "Functional Capacity Assessment" that Plaintiff could maintain concentration, persistence and pace for "at least" two hour segments and adapt to routine/infrequent changes in workplace (Tr. 256). He also concluded Plaintiff would have difficulty interacting with co-workers, peers and the public and was best suited for working with things rather than people (Tr. 256). On December 19, 2010, Jeffrey T. Bryant, Ph.D., another State agency psychological consultant, stated that he reviewed the evidence in the file, and agreed with Dr. Kupstas' assessment as written (Tr. 280).

Doc. 12, pgs. 2-8].

Ms. Donna Bardsley, a vocational expert, appeared at the hearing. She was asked to assume no exertional limitations, but to assume that the plaintiff was mentally limited to simple, routine and repetitive tasks due to difficulties with concentration. She was asked to assume he could only adapt to gradual and infrequent changes in the work setting. He was limited to work with no public interaction and only occasional interaction with co-workers and supervisors, and that supervision would be "direct and non-confrontational." Ms. Bardsley stated that the plaintiff could perform the job of hand packer, with 550 in the regional economy and 700,000 in the nation; sorter with 400 in the region and 425,000 in the nation; assembler with 475 in the region and 625,000 in the nation, and inspector with 450 in the region and 300,000 in the nation. Ms. Bardsley was then asked to assume that the plaintiff was mentally limited as set forth in "the assessments of Dr. Sherman [*sic*][2] as well as Ms. Abbott." If that were the case, Ms. Bardsley stated there would be no jobs which the plaintiff could perform. [Doc. 58].

---

[2] Obviously, the reference was to Dr. Schureman.

5

The ALJ found that the plaintiff had a "severe combination of impairments." Although he found no physical impairment, he determined that the plaintiff had a history of attention deficit hyperactivity disorder (ADHD), an affective disorder, an anxiety disorder, a learning disorder and Asperger's Syndrome. [Tr. 24]. He found that the plaintiff did not have a "listed impairment" entitling him to a finding of disability based upon the applicable regulations. [Tr. 25].

The ALJ next opined as to the plaintiff's residual functional capacity [RFC]. He found that the plaintiff could "perform a full range of work at all exertional levels but with ...nonexertional limitations." The ALJ found "he has the ability to perfomr simple, routine, repetitive tasks; to adapt to gradual and infrequent changes in the work setting; and to maintain concentration and persistence for simple, routine, repetitive tasks. He is limited to work that requires no interaction with the public and no more than occasional interaction with coworkers and supervisors; and is limited to work where supervision is direct and non-confrontational." [Tr. 25]. The ALJ noted that the plaintiff testified that he had the various mental conditions listed in the RFC finding. Plaintiff also testified that he was not receiving treatment or taking medications for these impairments. Plaintiff stated he can stay on task for two to three hours during a normal day. He testified that he prepares meals, washes dishes, does laundry, watches television and uses a computer. [Tr. 27].

The ALJ found that while the plaintiff does have "the alleged symptoms," plaintiff's testimony as to "the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." [Tr. 27].

6

The ALJ noted that before the plaintiff applied for benefits, he had several psychological evaluations and had a previous history of therapy, medication and coaching. He noted plaintiff's IQ was at least average, with a verbal IQ of 122, a performance IQ of 129, and a full scale IQ of 129. He mentioned that the plaintiff had taken college courses. The ALJ stated that while being treated by Dr. Robertson at the Center for Family Psychiatry in early 2009, plaintiff's "mother reported that medication use had a significant impact in symptom control." Later treatment by Family Physicians of Greeneville had the mother reporting that "she was very pleased with the medication and that the [plaintiff] was more productive." In January 2010, on month before the plaintiff applied for benefits, the record indicated plaintiff did no want to take medications but was getting along very well without them. [Tr. 27-28].

The ALJ then discussed Ms. Abbott's psychological evaluation. He noted the plaintiff related well with Ms. Abbott in areas where his high intelligence was evident, such as his appropriate communication, providing his history including dates, recalling information, and interpreting sayings and solving math problems. He then noted Ms. Abbott's severe restrictions upon plaintiff. [Tr. 28-29].

He then discussed Dr. Schureman's opinions set forth in his note of October 25, 2010. The ALJ was obviously familiar with Dr. Schureman's assessment of the plaintiff and the reasons for his conclusions regarding the plaintiff's functional limitations. [Tr. 29].

The ALJ then stated that "the evidence of record does not support a finding of disability." He stated that claimant's subjective complaints were "not supported by the evidence of record." With respect to the plaintiff's mental impairment, the ALJ noted no

7

treatment since the application date, and plaintiff refusing treatment with medication. He went into detail about the plaintiff's daily activities, including driving and taking care of his dog, in addition to those mentioned above. At the hearing the ALJ noted that the plaintiff "conversed easily and displayed no signs of social anxiety or frustration. Further, the plaintiff "did not present any abnormal thought processes as well as no evidence of socially inappropriate behavior during the course of the hearing." [Tr. 30] Given the plaintiff's demeanor and intelligent responses at the hearing, the ALJ simply did not believe he was near recluse described by some of his mental health evaluators.

The ALJ gave great weight to the opinions of the State Agency consultants. He gave "little weight to the opinions of Ms. Abbott and Dr. Schureman because their opinions..." were inconsistent with the plaintiff's activities of daily living, based heavily on self-reports, not supported by clinical findings, inconsistent with other substantial medical evidence, "and inconsistent with the [plaintiff's] benign presentation, treatment record, and objective testing." [Tr. 30].

Given the testimony of Ms. Bardsley, the ALJ concluded that there were a significant number of jobs which the plaintiff could perform. Accordingly, he found that the plaintiff was not disabled. [Tr. 31].

Plaintiff asserts that the ALJ did not give proper weight to Dr. Schureman, the treating psychologist from 2002 to 2005, and Ms. Abbott, the examiner selected by the Commissioner to examine and evaluate the plaintiff's mental impairments. Plaintiff also asserts that the Commissioner did not properly discuss the reasons for not giving controlling weight to Dr. Schureman in his role as a long-term treating source, thus running afoul of *Blakley v.*

Case 2:12-cv-00453-JRG-MCLC Document 13 Filed 12/30/13 Page 8 of 15 PageID #: 79

*Commissioner of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009), *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011), and the defendant's regulations requiring an explanation of the reasons for not crediting such treating sources. Plaintiff also states that the hypothetical question to the VE did not adequately describe the restrictions imposed by the plaintiff's mental impairments.

In the recent case of *Cole*, *supra*, the Sixth Circuit went into great detail about how ALJ's must evaluate testimony of a treating physician or psychologist, such as Dr. Schureman. In this regard, the Court stated:

> ...the Commissioner has mandated that the ALJ "will" give a treating source's opinion controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(d)(2). If the ALJ declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir.2004) (citing 20 C.F.R. § 404.1527(d)(2)).
>
> Importantly, the Commissioner imposes on its decision makers a clear duty to "always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion." 20 C.F.R. § 404.1527(d)(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96–2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996). This requirement is not simply a formality; it is to safeguard the claimant's procedural rights. It is intended "to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that [ ]he is not." *Wilson,* 378 F.3d at 544.

*Id.*, at 937.

9

It is thus not enough for the ALJ to have substantial evidence supporting his or her decision to give little or no weight to a treating source. The Commissioner's regulations give the claimant a "procedural right" to understand from reading the hearing decision why their doctor's opinion was not enough for them to be found to be disabled.

The depth and clarity of the ALJ's analysis of a treating medical source's opinion is also deemed essential to the judicial review process. "[T]hose good reasons [for not giving great weight to a treating source" must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.' Soc. Sec. Rul 96-2p, 1996 WL 374188, at *5." *Blakley v. Commissioner of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009). *Wilson*, relying on *Rogers v. Commissioner of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007), also states:

> [w]e have held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given "*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record."...(emphasis added).

*Id.*

*Blakley* also points out that "[A] finding that a treating source medical opinion...is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected...Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Id.* at 408. Those factors, set forth in 20 C.F.R. § 404.1527(d)(2), include the length of the treatment relation, the

10

"supportability" of the opinion, the consistency of the opinion with the rest of the record, and any specialization of the treating source.

*Blakley* also held that the failure of the ALJ "to give good reasons for according less than contolling weight to treating sources,..." is not harmless error where the reviewing court cannot "engage in meaningful review of the ALJ's decision." *Id.* At 409 (internal citations omitted.)

The impact of these cases is that the regulations require that the ALJ have substantial evidence for not giving a treating source controlling weight, that the ALJ explain in the hearing decision with "sufficient specificity" the reasons for the weight given in language that the claimant, Appeals Counsel, and reviewing courts can understand, and must still weigh the treating source's opinion even if it is not given controlling weight. If meaningful review is stymied, this failure cannot be harmless error.

All of the requirements of *Blakley*, *Cole*, and other cases are not new law. Each and every one of these requirements is set forth in the Commissioner's regulations and rulings. The cases are a judicial reemphasis of the importance of these regulations, both to a reviewing court and to the overall credibility of the administrative adjudicative process.

While this hearing decision may not be a model for total compliance with the regulations, the ALJ does go to considerable lengths to explain his rejection of Dr. Schureman's opinion. From his considerable discussion of Dr. Schureman's letter, it is obvious that the ALJ was cognizant of the status of Dr. Schureman as a treating psychologist, the length of the treatment relationship, and that the treatment relationship ended in 2005, five years before the plaintiff applied for benefits. [Tr. 29].

11

The ALJ "lumped" his evaluation of the weight given to Dr. Schureman with that of Ms. Donna Abbott, the psychological examiner who did a consultative examination for the Commissioner. Again, his finding was that he gave "little weight to the opinions of Ms. Abbott and Dr. Schureman because their opinions..." were inconsistent with the plaintiff's activities of daily living, based heavily on self-reports, not supported by clinical findings, inconsistent with other substantial medical evidence, "and inconsistent with the [plaintiff's] benign presentation, treatment record, and objective testing." [Tr. 30].

Each of those factors was discussed in detail in the ALJ's discussion of the various records of treatment, psychological testing, and plaintiff's activities of daily living. The ALJ clearly stated his analysis of these, and the credibility he gave the plaintiff when he was describing his limitations, as follows:

> Concerning the claimant's mental impairments, the medical evidence of record shows that the claimant has had no treatment since the date of his application for supplemental security income benefits and that the has refused treatment with prescribed medication since the application date. Intellectual testing indicated that the claimant's intellectual functioning was in the normal range. With regard to activities of daily living, the claimant reported that he shops, cleans, cooks, and uses a computer for several hours a day. During the hearing, the claimant testified that even on a bad day, he could concentrate for two to three hours at a time. The claimant's record shows that the reads, watches television, and makes jewelry. The record further indicates that he provides care for a dog. The record notes that the claimant drives and rides in a car. The claimant's function reports indicate that the claimant talks to family members and uses a computer to communicate with friends and that he gets along with family and authority figures. The claimant reported that he plays video games. He indicated that he has his own checking account and that he can manage his own money. The claimant reported that he had started a garden in 2010. The record further indicates that the claimant graduated from high school and also attended college courses. The claimant indicated that he traveled and took trips to Las Vegas. During the hearing, the undersigned observed that the claimant conversed easily and displayed no signs of social anxiety or frustration. Further, the claimant did not present any abnormal thought processes as well as no evidence of socially inappropriate behavior during the course of the hearing.

Case 2:12-cv-00453-JRG-MCLC   Document 13   Filed 12/30/13   Page 12 of 15   PageID #: 83

[Tr. 29-30].

The ALJ also noted that the plaintiff's mother had indicated to Family Physicians of Greeneville that in 2009 plaintiff she was very pleased with plaintiff's medication. Plaintiff then refused to continue the medications leaving the doctor with no options. A treatment record the month before the plaintiff's application was filed in 2010 indicated that the plaintiff was "getting along very well without medications." [Tr. 28].

In the opinion of the Court, the ALJ assigned valid and understandable reasons for the weight he gave to Dr. Schureman.

The critical question is with what expert *does* the ALJ agree? Every single doctor or psychologist who treated or examined the plaintiff found symptoms which, according to the VE, would mean there were no jobs the plaintiff could perform. The ALJ ultimately relied entirely on the non-examining psychologists from the State Agency. The first State Agency psychologist, Dr. Kupstas, gave his assessment on August 20, 2010. This was over two months before Dr. Schureman's opinion was placed in the record. Ultimately, it is the December 19, 2010 one page "report of contact" of Dr. Bryant that provides an opinion by the only person who presumably had an opportunity to review Dr. Schureman's report along with the rest of the record. Dr. Bryant simply says "[a]fter review of the evidence in file, the prior mental assessment of 8/20/10 appears correct and consistent with available MER. The prior mental assessment is still supported and is hereby affirmed as written." [Tr. 280].

The plaintiff is obviously a high-functioning individual of at least average intelligence. Based upon his college work and travel, he could easily be seen as above average. However, every single treating source has placed severe limitations on the

13

plaintiff. The ALJ's RFC, and his hypothetical to the VE, adopt some of these limitations, but ultimately it is only the State Agency psychologists, and ultimately Dr. Bryant alone ratifying Dr. Kupstas, upon which all of this rests. Even Dr. Kupstas opined that plaintiff could "maintain CPP for periods of at lest 2 hours." [Tr. 256]. What exactly does this mean? Is that in toto for workday, or at a time between breaks? If so, how long a break is necessary for the plaintiff to enter another period where his concentration and persistence is adequate to perform his job duties?

The Court does not know whether or not the plaintiff is disabled. That is not the Court's job in any event. There are instances where the opinion of a State Agency non-examining physician or psychologist can provide all the substantial evidence needed to support a finding that a claimant is not disabled, even when contrary to a treating source. However, this case is far too close on the facts and findings for that to be the situation here. The Court does not feel that the Commissioner's position is substantially justified.

Disability is not so clearly established as to warrant a judicial order of benefits, at least at this point. The Commissioner makes the rather irritating argument that the opinion of Ms. Abbott, to whom *the Commissioner sent the plaintiff*, is worthy of no consideration. The Court doesn't feel that the Commissioner is always "stuck" with it's own consultant's opinion, but the proper argument is not that her opinion would have been virtually worthless anyway. Ms. Abbott's opinions have been the lynchpin of numerous affirmations of the Commissioner in the past, and no doubt her favorable opinions will be defended vigorously by the Commissioner in future cases. Hopefully this judicial "aside" is understandable to the Commissioner.

It is recommended that the case be remanded to the Commissioner for further evaluation of the limitations imposed by plaintiff's mental impairments, including professional examination. To this extent, it is recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 9] be GRANTED, and that the defendant Commissioner's Motion for Summary Judgment [Doc. 11] be DENIED.[3]

Respectfully submitted,

  s/ Dennis H. Inman
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).